Filed: September 1, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE ex rel CONRAD R. ENGWEILER,

Petitioner on Review,

v.

AARON FELTON,
Chairperson of the Board of Parole and Post-Prison Supervision,

Respondent on Review.

(CC 07C18859; CA A139059; SC S058311)

---

STATE ex rel SHANE I. SOPHER,

Petitioner on Review,

v.

MICHAEL WASHINGTON,
Chairperson of the Oregon Board of Parole and Post-Prison Supervision,

Respondent on Review.

(CC 06C14844; CA A134157; SC S058373)

---

SHANE I. SOPHER,

Petitioner on Review,

v.

BOARD OF PAROLE AND POST-PRISON SUPERVISION,

Respondent on Review.

(CA A128108; SC S058327)

1

On review from the Court of Appeals.*

Argued and submitted December 1, 2010.

Andy Simrin, Portland, argued the cause and filed the brief for petitioner on review Conrad R. Engweiler. Kristina Hellman, Federal Public Defender - District of Oregon, Portland, argued the cause and filed the briefs for petitioner on review Shane I. Sopher.

Jeremy C. Rice, Assistant Attorney General, Salem argued the cause for respondents on review Aaron Felton, Chairperson of the Board of Parole and Post-Prison Supervision; Michael Washington, Chairperson of the Oregon Board of Parole and Post-Prison Supervision; and Oregon Board of Parole and Post-Prison Supervision. With him on the briefs were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before, De Muniz, Chief Justice, and Durham, Balmer, Kistler, Walters, and Linder, Justices.**

The decision of the Court of Appeals in *Sopher v. Board of Parole*, 233 Or App 178, 225 P3d 836 (2010) is reversed. The decision of the Court of Appeals in *State ex rel Engweiler v. Powers*, 232 Or App 214, 221 P3d 818 (2009) is reversed and the trial court's issuance of the writ is affirmed. The decision of the Court of Appeals in *State ex rel Sopher v. Washington*, 233 Or App 228, 225 P3d 142 (2010) is affirmed in part and vacated in part.

Linder, J., dissented and filed an opinion in which Kistler, J., joined.

*Appeal from Marion County Circuit Court, Paul J. Lipscomb, Judge. 232 Or App 214, 221 P3d 818 (2009).

Appeal from Marion County Circuit Court, Don A. Dickey, Judge. 233 Or App 228, 225 P3d 142 (2010).

Judicial Review of Permanent Rules Adopted by the Oregon Board of Parole and Post-Prison Supervision. 233 Or App 178, 225 P3d 836 (2010).

**Gillette, J., retired December 31, 2010, and did not participate in the decision of this case. Landau, J., did not participate in the consideration or decision of this case.

DE MUNIZ, C. J.

These three cases, which we have consolidated for purposes of argument and opinion, involve one administrative rule challenge (ORS 183.400) and two mandamus actions (ORS 34.110) brought by two prison inmates, each convicted of aggravated murder that he committed when he was less than 17 years of age.[1]

In the rule challenge brought by petitioner Sopher, he contends that the board exceeded its statutory authority when it promulgated administrative rules (the juvenile aggravated murder, or JAM, rules) that provide for a parole review hearing (rather than a parole hearing for the purpose of setting an initial parole release date) after no fewer than 20 years of incarceration, at which time a person convicted of juvenile aggravated murder may attempt to establish his or her suitability for eventual parole. In Sopher's rule challenge case, the Court of Appeals concluded that the board did not exceed its statutory authority in promulgating those rules, because ORS 144.110(2)(b) and ORS 163.105(2) to (4)[2] require the intermediate process established in the JAM rules. *Sopher v. Board of Parole*, 233 Or App 178, 225 P3d 836 (2010) (*Sopher II*).

In the two mandamus cases, relators Engweiler and Sopher each contend that the board was required under ORS 144.120(1) (1989) and ORS 144.120(1) (1991),

---

[1]    Throughout this opinion, we refer to inmates who committed aggravated murder when they were less than 17 years of age, collectively, as "juvenile aggravated murderers."

[2]    We set out the text of the pertinent statutes later in this opinion.

3

respectively, to conduct a parole hearing and set an initial parole release date for each of them. In each case, the Court of Appeals held, among other things, that ORS 144.110(2)(b) and ORS 163.105(2) to (4) obviate any requirement in ORS 144.120(1) (1989) or ORS 144.120(1) (1991) that the board conduct such a hearing or set an initial release date for juvenile aggravated murderers. *State ex rel Engweiler v. Powers*, 232 Or App 214, 221 P3d 818 (2009) (*Engweiler VI*);[3] *State ex rel Sopher v. Washington*, 233 Or App 228, 225 P3d 142 (2010) (*Sopher III*).

The common denominator in the three cases is the applicability to juvenile

___

[3] As we discuss in more detail below, Engweiler has appeared before the Court of Appeals and this court multiple times since his incarceration in 1991, resulting in, as pertinent to this case, six separate judicial opinions. For convenience and for clarity, we set them all out here, with reference numbers based on their order of initial publication:

1. *State v. Engweiler*, 118 Or App 132, 846 P2d 1163, *rev den*, 317 Or 486 (1993) (*Engweiler I*).

2. *Engweiler v. Board of Parole*, 197 Or App 43, 103 P3d 1201 (2005) (*Engweiler II*).

3. *Engweiler v. Board of Parole*, 340 Or 361, 133 P3d 910 (2006) (*Engweiler III*).

4. *State ex rel Engweiler v. Cook*, 340 Or 373, 133 P3d 904 (2006) (*Engweiler IV*).

5. *Engweiler v. Board of Parole*, 343 Or 536, 175 P3d 408 (2007) (*Engweiler V*).

6. *State ex rel Engweiler v. Powers*, 232 Or App 214, 221 P3d 818 (2009) (*Engweiler VI*).

After Engweiler filed his petition for review of the Court of Appeals decision in *Engweiler VI*, the Court of Appeals granted the board's motion to amend the case caption to reflect that Aaron Felton is now the board's chairman.

4

aggravated murderers of ORS 144.110(2)(b) and ORS 163.105(2) to (4). For the reasons set forth below, we conclude that ORS 144.110(2)(b) and ORS 163.105(2) to (4) do not apply to juvenile aggravated murderers. For that reason and others explained below, we also conclude that the board exceeded its statutory authority when it promulgated rules requiring juvenile aggravated murderers to undergo the intermediate review process described in ORS 163.105(2) to (4) before the board makes parole release decisions regarding them. Finally, we conclude that the legislature provided the board with authority in ORS 144.120(1) (1989) and ORS 144.120(1) (1991) to determine initial release on parole for inmates like these who are serving an indeterminate sentence of life imprisonment with the possibility of parole. We also conclude that ORS 144.120(1) (1989) imposed on the board a legal duty to conduct a parole hearing for Engweiler to set an initial release date for him or explain why it chooses not to do so. As to Sopher, we hold that ORS 144.120(1) (1999) entitles him to a hearing at some point to set an initial parole release date, but that the board has no present legal duty to conduct such a hearing and, therefore, Sopher does not have a remedy in mandamus. We therefore reverse the Court of Appeals decision in *Engweiler VI*, reverse the Court of Appeals decision in *Sopher II*, and affirm in part and vacate in part the Court of Appeals decision in *Sopher III*.[4]

---

[4] In a second claim for relief in Sopher's petition for writ of mandamus, Sopher alleged that the board's application of the JAM rules, as to him, was unlawful in various respects and that the board had a nondiscretionary duty to correct the errors. The trial court mischaracterized Sopher's argument as a contention that the board did not have

I.  BACKGROUND

We briefly summarize the factual and procedural background of each of the petitioners' cases.  Engweiler committed aggravated murder in 1990, when he was 15 years old.  He was tried as an adult, and, on his conviction, the trial court imposed a life sentence with a 30-year mandatory minimum term of imprisonment under ORS 163.105(1)(c) (1989).  Engweiler appealed, arguing, among other things, that the sentence that the trial court imposed was unlawful, because ORS 161.620 (1989) prohibited trial courts from imposing a mandatory minimum sentence on any person who was remanded from the juvenile court and was under 17 years of age at the time that he committed the crime for which he was remanded.  The Court of Appeals agreed with that argument and vacated the sentence. *State v. Engweiler*, 118 Or App 132, 136, 846 P2d 1163, *rev den*, 317 Or 486 (1993) (*Engweiler I*).  In 1994, Engweiler was resentenced to life in prison.

---

discretion to adopt the JAM rules, and it denied relief on the ground that mandamus "will not lie to challenge the Board's exercise of discretion."  On appeal, the board conceded that the trial court erred in dismissing Sopher's claim on that ground, and the Court of Appeals accepted that concession. *Sopher III*, 233 Or App at 238.  The Court of Appeals therefore reversed the trial court's dismissal of Sopher's second claim and remanded the case in part for reconsideration on that ground. *Id.*  Neither Sopher nor the board addresses that issue in this court.  However, because we hold that the board has a duty to conduct a parole release hearing on Sopher's behalf under ORS 144.120(1)(a) (1991), and that the board exceeded its statutory authority in promulgating the JAM rules, it is unnecessary to remand this case to the board for consideration of whether the board incorrectly applied the JAM rules to Sopher.  For that reason, we vacate that part of the Court of Appeals decision reversing the trial court's dismissal of Sopher's second claim and remanding that claim to the board for reconsideration.

Sopher committed aggravated murder in 1992, when he was 16 years old. He, too, was remanded from the juvenile court and tried as an adult. Upon his aggravated murder conviction, the trial court imposed a sentence of life in prison.

In *State ex rel Engweiler v. Cook*, 340 Or 373, 380-81, 133 P3d 904 (2006) (*Engweiler IV*), this court explained that, at the time Engweiler committed his crime, a sentence of life in prison was:

> "an indeterminate sentence [which] state[s] only a maximum term to be served under the jurisdiction of the Department of Corrections. Such a sentence did not establish the length of time that a defendant was to be incarcerated."

And, with regard to an indeterminate sentence, the legislature had granted authority to the Executive Branch to establish an inmate's actual duration of imprisonment, using a parole matrix that the legislature directed the board to create. *Id.* at 381; Or Laws 1977, ch 372, § 2.

Oregon had an indeterminate sentencing scheme before 1989 and used a parole matrix system for establishing the actual term of imprisonment for most felony offenders. 340 Or at 831. In 1989, the legislature replaced that scheme with a new "guidelines" sentencing scheme, under which the Judicial Branch (judges) are required to impose determinate sentences -- defined presumptive punishments, based on sentencing guidelines that were created by the State Sentencing Guidelines Board and later approved by the state legislature -- for most felony convictions. Under the guidelines scheme, judges have little discretion to deviate from the guidelines ranges and criminal defendants subject to guidelines sentencing are not eligible for release on parole. *Id.*; *Engweiler v.*

7

*Board of Parole*, 343 Or 536, 540-41, 175 P3d 408 (2007) (*Engweiler V*).

However, juvenile aggravated murderers like Engweiler and Sopher continued to receive life sentences until 1995. *Engweiler IV*, 340 Or at 381-82 (inmates who committed aggravated murder after November 1, 1989, but who were juveniles at the time of their crimes continued to receive indeterminate sentences and the board set their terms of incarceration); *Engweiler V*, 343 Or at 545 (juvenile aggravated murderers are entitled to the possibility of parole).

Although juvenile aggravated murderers were entitled to the possibility of parole after 1989, the board had no rules governing parole decisions for them. *See Engweiler V*, 343 Or at 548 (board rules "contained a void" with respect to juvenile aggravated murderers). In 1999, to address that situation, the board promulgated a set of administrative rules to be applied to determine whether and when to grant parole release to juvenile aggravated murderers. Those rules are known as the JAM rules. As this court explained in *Engweiler V*,

"[T]he JAM rules require the board to hold an initial 'prison term hearing' for juveniles convicted of murder who were under age 17 at the time of the offense. OAR 255-032-0005(4) (1999). At that hearing, the board sets 'a review date * * * rather than a projected parole release date.' *Id*. Alternatively, the board may 'deny parole' altogether. OAR 255-032-0011(2) (1999). If the board opts to set a review date, it does so based on a parole release matrix that it adopted specifically for juvenile aggravated murderers who are eligible for parole consideration. *Id*. (cross-referencing Exhibit P-III). Essentially, that matrix establishes ranges of time periods that dictate whether and when a juvenile aggravated murderer will be reviewed for parole eligibility and will receive a parole release date. At the low end, the matrix can result in a review date between 240 and 300 months. *Id*. At the high end, it can result in a 'life' term, which is a denial of parole. *Id*. The review date then triggers a schedule for further board review of the inmate's institutional conduct and rehabilitation efforts, after

which the board may establish a parole release date under the matrix or may set another review date at which it will further review the inmate's conduct and rehabilitation efforts. OAR 255-032-0011(6)-(7) (1999); *see also State ex rel Engweiler*, 340 Or at 383 (so concluding). If the board denies parole, the inmate is not totally foreclosed from future parole consideration. Rather, after 480 months, the inmate may petition the board for further review, and then may continue to do so periodically. OAR 255-032-0011(5), (7) (1999)."

343 Or at 549. Pursuant to the JAM rules, the board conducted a prison term hearing for Engweiler in June 1999 and set a review date for him in 2030, after 480 months (40 years) of incarceration. The board conducted a prison term hearing for Sopher in August 1999, and set a review date for him in 2025, after 400 months (33 years and 4 months) of incarceration.

Subsequently, both Engweiler and Sopher petitioned for judicial review of the board orders setting their review dates. In each case, the Court of Appeals held that the board's order setting the review date was not subject to judicial review. *Engweiler v. Board of Parole*, 197 Or App 43, 103 P3d 1201 (2005) (*Engweiler II*); *Sopher v. Board of Parole*, 197 Or App 118, 103 P3d 683 (2005) (*Sopher I*).

Engweiler petitioned for review, and this court affirmed the Court of Appeals decision in his case. *Engweiler v. Board of Parole*, 340 Or 361, 133 P3d 910 (2006) (*Engweiler III*).

Sopher took a different tack. In 2005, he initiated a rule challenge in the Court of Appeals under ORS 183.400, which permits such actions but limits judicial review to an examination of the rule under review, the statutory provisions authorizing the rule, and the documents demonstrating compliance with applicable rulemaking

9

procedures.[5] Sopher argued that, by requiring juvenile aggravated murderers to complete an intermediate review process before the board considers them for parole eligibility, the JAM rules impermissibly deprive juvenile aggravated murderers of the immediate parole release eligibility that ORS 161.620 guarantees them. Specifically, he argued that the board relied on ORS 144.110(2)(b) (1997), ORS 163.105(1) (1997), ORS 144.780 (1997), and ORS 161.620 (1994) in promulgating the JAM rules, but that none of those

---

[5] As pertinent here, ORS 183.400 provides:

"(1) The validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases. The court shall have jurisdiction to review the validity of the rule whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question, but not when the petitioner is a party to an order or a contested case in which the validity of the rule may be determined by a court.

"* * * * *

"(3) Judicial review of a rule shall be limited to an examination of:

"(a) The rule under review;

"(b) The statutory provisions authorizing the rule; and

"(c) Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures.

"(4) The court shall declare the rule invalid only if it finds that the rule:

"(a) Violates constitutional provisions;

"(b) Exceeds the statutory authority of the agency; or

"(c) Was adopted without compliance with applicable rulemaking procedures."

10

statutes authorized the board to require that intermediate review process for juvenile aggravated murderers.

While that rule challenge was pending in the Court of Appeals, both Engweiler and Sopher also brought the instant mandamus actions to compel the board to conduct hearings and establish initial release dates for both of them under ORS 144.120(1)(a) (1989) (in Engweiler's case) and ORS 144.120(1)(a) (1991) (in Sopher's).[6]

In his mandamus action, Engweiler argued that ORS 144.120(1)(a) (1989) required that process in his case. That statute provided:

> "Within six months of the admission of a prisoner to any Department of Corrections institution, with the exception of those prisoners sentenced to a term of imprisonment for life or for more than five years, the board shall conduct a parole hearing to interview the prisoner and set the initial date of release on parole pursuant to subsection (2) of this section. For those prisoners sentenced to a term of imprisonment for more than five years but less than 15 years, the board shall conduct the parole hearing and set the initial date of release within eight months following admission of the prisoner to the institution. *For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution.* Release shall be contingent upon satisfaction of the requirements of ORS 144.125."

(Emphasis added.) Engweiler argued that the wording in the foregoing statute is mandatory and gave the board no discretion to decline to conduct a hearing and set an

---

[6] In their petitions for writs of mandamus, Engweiler and Sopher alleged, among other things, that the board failed to perform its nondiscretionary, statutory duty to conduct an initial parole release hearing and set an initial parole release date, that the board had established a parole release date for other juvenile aggravated murderers, and that the board's failure to set an initial release date for them violated their constitutional rights in various respects.

11

initial release date. The board replied that, in 1991, ORS 144.120(1)(a) was amended to exclude offenders who were sentenced for murder or aggravated murder,[7] and that the 1991 version of the statute applied to Engweiler because he was resentenced in 1994. Engweiler responded that application of the 1991 version of the statute to him would violate constitutional *ex post facto* prohibitions. The board countered that the amendment was procedural rather than substantive and, therefore, that the amended statute constitutionally could be applied in Engweiler's case. The trial court rejected the board's argument; it concluded that the 1989 version of the statute applied to Engweiler and that that statute required the board to conduct a hearing and set an initial release date. Accordingly, the trial court issued a writ directing the board to hold a hearing and set an initial release date as provided in that statute.

The board appealed that ruling to the Court of Appeals. On appeal, the board repeated its argument that the 1991 version of ORS 144.110(1)(a) applied in Engweiler's case because he had been resentenced in 1994, and that that statute clearly excluded those sentenced for aggravated murder from the hearing requirement. In

---

[7] In 1991, the italicized sentence in ORS 144.120(1)(a) (1989), above, was amended to read as follows:

"For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, *with the exception of those sentenced for aggravated murder*, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution."

Or Laws 1991, ch 126, § 6 (emphasis added).

12

addition, the board argued that, even if the 1991 version did not apply, the 1989 version did not mandate a hearing in Engweiler's case, because ORS 144.120 is qualified by another, related statute, ORS 144.110(2)(b), which provided that ORS 144.120 (1989) did not apply to prisoners who had been convicted of aggravated murder.

The Court of Appeals reversed. That court did not address whether the 1991 or 1989 version of ORS 144.120 applied, because it agreed with the board's second argument. The Court of Appeals observed that "ORS 144.110(2)(b) (1989) operated as an exception to ORS 144.120(1)(a) (1989)." *Engweiler VI*, 232 Or App at 223. ORS 144.110(2)(b) (1989)[8] provided:

"Notwithstanding the provisions of ORS 144.120 [relating to parole hearings and the setting of initial parole release dates] and 144.780 [directing the board to promulgate rules establishing the parole matrix]:

"* * * * *

"(b) The board shall not release a prisoner on parole who has been convicted of murder defined as aggravated murder under the provisions of ORS 163.095, except as provided in ORS 163.105."

ORS 163.105 (1989)[9] provided, in turn, as follows:

"Notwithstanding the provisions of ORS chapter 144 [relating generally to parole and work release], ORS 421.165 [relating to temporary leave] and ORS 421.450 to 421.490 [relating to forest and work camps]:

---

[8] ORS 144.110 (1989) was identical in all material respects to ORS 144.110 (1991). For convenience, we refer at all times in this opinion to the 1989 version of ORS 144.110.

[9] ORS 163.105 (1989) was identical in all material respects to ORS 163.105 (1991). For convenience, we refer at all times in this opinion to the 1989 version of ORS 163.105.

"(1) When a defendant is convicted of aggravated murder as defined by ORS 163.095, the defendant shall be sentenced, pursuant to ORS 163.150, to death, life imprisonment without the possibility of release or parole or life imprisonment.

"* * * * *

"(c) If sentenced to life imprisonment, the court shall order that the defendant shall be confined for a minimum of 30 years without possibility of parole, release on work release or any form of temporary leave or employment at a forest or work camp.

"(2) At any time after 20 years from the date of imposition of a minimum period of confinement pursuant to paragraph (c) of subsection (1) of this section, the State Board of Parole and Post-Prison Supervision, upon the petition of a prisoner so confined, shall hold a hearing to determine if the prisoner is likely to be rehabilitated within a reasonable period of time. The sole issue shall be whether or not the prisoner is likely to be rehabilitated within a reasonable period of time. * * *.

"(3) If, upon hearing all of the evidence, the board, upon a unanimous vote of all five members, finds that the prisoner is capable of rehabilitation and that the terms of the prisoner's confinement should be changed to life imprisonment with the possibility of parole, or work release, it shall enter an order to that effect and the order shall convert the terms of the prisoner's confinement to life imprisonment with the possibility of parole or work release. Otherwise, the board shall deny the relief sought in the petition.

"(4) Not less than two years after the denial of the relief sought in a petition under this section, the prisoner may petition again for a change in the terms of confinement. Further petitions for a change may be filed at intervals of not less than two years thereafter."

The Court of Appeals noted that, on its face, ORS 144.110(2)(b) appeared directly applicable to Engweiler. *Engweiler VI*, 232 Or App at 223.

However, the court acknowledged, ORS 161.620 (1989),[10] which limited

_____

[10] The 1989 version of ORS 161.620 is identical to the version in effect in

courts' sentencing options for juvenile aggravated murderers, rendered parts of ORS 163.105 inapplicable to juvenile aggravated murderers. ORS 161.620 provided:

> "Notwithstanding any other provision of law, a sentence imposed upon any person remanded from the juvenile court under [*former*] ORS 419.533 [(1989)] shall not include any sentence of death or life imprisonment without the possibility of release or parole nor imposition of any mandatory minimum sentence except that a mandatory minimum sentence under ORS 163.105(1)(c) shall be imposed where the person was 17 years of age at the time of the offense."

Engweiler had argued that that statute irreconcilably conflicted with the application of ORS 144.110 and ORS 163.105 to juvenile aggravated murderers, because the assumption underlying the latter two statutes -- that an aggravated murderer will be sentenced to no less than a 30-year mandatory minimum term of imprisonment -- does not apply to juveniles, and, therefore, the parole release process set out in ORS 163.105(2) to (4) cannot apply either. The Court of Appeals rejected that argument, concluding that it was possible to harmonize all the applicable statutes. That court reasoned that ORS 161.620 was a directive to the sentencing courts limiting the types of sentences that may be imposed for the crime of aggravated murder when committed by a juvenile under the age of 17:

> "[That statute] said nothing, however, about the authority of *the board* to implement the remaining portions of the statute concerning release decisions, as set out in ORS 163.105(2) to (4) (1989). * * * In other words, merely because *a court* may not impose a particular sentence mentioned in ORS 163.105(1) does not necessarily require the conclusion that *the board*

1991, when Sopher committed his crime. For convenience, we refer at all times in this opinion to the 1989 version of ORS 161.620.

15

does not remain subject to the requirements of the balance of the statute with respect to juvenile aggravated murderers."

*Engweiler VI*, 232 Or App at 227 (emphasis in original). According to the Court of Appeals, the parts of ORS 163.105 -- subsections (2) and (3) -- that provide for the conversion by the board of a 30-year mandatory minimum sentence for aggravated murderers who have shown that they are capable of rehabilitation are not in conflict with ORS 161.620, which merely states that trial courts cannot impose mandatory minimum sentences on juvenile aggravated murderers. *Id.* at 227-28.

Finally, the Court of Appeals rejected Engweiler's argument that ORS 163.105(2) to (4) are inapplicable to his case because they provide for the "conversion" of a mandatory minimum sentence to a sentence of life imprisonment, and he already is serving such a sentence. The court disagreed, stating,

"An assumption implicit in [Engweiler's] argument is that the existence of some measure of redundancy in one or more statutes necessarily establishes an irreconcilable conflict between them. The assumption simply is not consistent with relevant case law. * * * Particularly -- as in this case -- when the alternative to accepting a measure of redundancy in legislation is to hold that some portion of a statute simply does not mean what it says, the courts routinely hold in favor of allowing for the redundancy."

*Id.* at 228. The Court of Appeals concluded that the focus of ORS 163.105(2) and (3) is on the board's obligation to determine the prisoner's rehabilitation status, and the mandate in those subsections for the board to "convert" the terms of the prisoner's confinement "is insufficient to nullify that purpose and the relevant procedures." *Id.* at 229.

As noted, Sopher also sought a writ of mandamus to compel the board to conduct a hearing and set an initial release date for him. In Sopher's case, the 1991

16

version of the statute clearly applied. The trial court in his case concluded that the board had no duty under that statute to set a parole release date, because the 1991 version of the statute expressly excluded offenders convicted of aggravated murder. Sopher appealed, and the Court of Appeals affirmed the trial court's ruling. That court agreed that ORS 144.120(1)(a) (1991) did not require a hearing or parole release date for any person who had been convicted of aggravated murder, and it noted that, in any event, in *Engweiler VI*, it held that juvenile aggravated murderers were subject to the aggravated murder review hearing process set out in ORS 144.110(2)(a) and ORS 163.105, and not the initial parole hearing process set out in ORS 144.120(1)(a).[11] *Sopher III*, 233 Or App at 236.

In Sopher's rule challenge, the Court of Appeals rejected Sopher's argument that the board exceeded its statutory authority in promulgating the JAM rules, for the same reasons that it rejected Engweiler's arguments in *Engweiler VI*. That is, the court stated that it held in *Engweiler VI* that, "consistently with ORS 161.620, juvenile aggravated murderers are subject to the standards and procedures described in ORS

---

[11] As discussed in note 4, above, the Court of Appeals also accepted the state's concession that the trial court erred in dismissing Sopher's second claim for relief and reversed in part the trial court's ruling on that ground.

In addition, Sopher made certain other arguments in the Court of Appeals revolving around a central claim that the board's refusal to give him a hearing under ORS 144.120(1)(a) (1991) violates various of his state and federal constitutional rights. The court rejected those arguments without extended discussion. *Sopher II*, 233 Or App at 180. In light of our holding that Sopher is entitled to a hearing under ORS 144.120(1)(a) (1991), we need not reach those issues.

17

144.110(2)(b) and ORS 163.105(2) to (4)." *Sopher II*, 233 Or App at 186. And, for that reason, the court held, the JAM rules, which implemented those standards and procedures, did not exceed the board's statutory authority under ORS 161.620. *Id.*

## II. DISCUSSION

At the outset, we believe it is important to keep in mind, as we have set out above, that this court is not writing on a clean slate. As noted, this court has addressed issues regarding Engweiler's sentence and incarceration on three previous occasions. Thus, with regard to Engweiler directly, and with regard to Sopher as a matter of precedent, the following legal principles are already established.

First, in *Engweiler IV*, this court described Engweiler's sentence as "life imprisonment with the possibility of release or parole" and observed that Engweiler was in the same position as an inmate serving an indeterminate sentence before the adoption of the guidelines sentencing scheme: The board is responsible for determining the actual duration of his imprisonment. 340 Or at 383.

Second, in *Engweiler V*, this court concluded that the "[n]otwithstanding any other provision of law" clause at the beginning of the text of ORS 161.620 (1989) means

> "that the terms of ORS 161.620 (1989) prevailed over 'any other provision of law.' In other words, the notwithstanding clause 'ma[kes] it irrelevant that ORS 144.110(2)(b) (1989) and ORS 163.105(1) (1989) each mandated a minimum sentence of 30 years without the possibility of parole for any person convicted of aggravated murder and made no exception for persons who were juveniles under the age of 17 when they committed [aggravated murder]."

343 Or at 544.

18

Third, in *Engweiler V,* the court also observed, as it had earlier in *Engweiler IV*, that juvenile aggravated murderers are "a small class of inmates who continued to receive indeterminate sentences," *Engweiler IV*, 340 Or at 381, and who are entitled to parole consideration:

> "ORS 161.620 (1989) trumped [ORS 144.110(2)(b) (1989) and ORS 163.105(1) (1989)] by precluding imposition of the 30-year mandatory minimum sentence otherwise authorized by ORS 163.105(1) (1989) for juveniles who were under age 17 when they committed aggravated murder. *Consequently, petitioners must be entitled to the possibility of parole.*"

*Engweiler V*, 343 Or at 545 (emphasis added).

Finally, in *Engweiler V*, this court observed that when Engweiler committed his crime, "none of the board's existing rules provided either procedural or substantive mechanisms to determine whether and when to parole juvenile aggravated murderers." *Id.* at 546.

Based on the foregoing, to resolve the rule challenge and the mandamus cases, this court must decide two questions with regard to each inmate: To what extent has the legislature granted the board authority to make parole release decisions in the case of juvenile aggravated murderers like these inmates? And, if the legislature has granted the board authority to make parole release decisions in these cases, what release procedures and criteria did the legislature intend for the board to apply with regard to each inmate?

To answer those questions, we first examine ORS 163.105, which grants the Executive Branch, through the board, release authority regarding inmates convicted of aggravated murder and sentenced to life imprisonment with a minimum period of

19

confinement of 30 years without the possibility of parole. We begin with that statute because the Court of Appeals concluded that ORS 163.105(2) to (4) apply to juvenile aggravated murderers, and thus authorized the board to adopt the JAM rules implementing release procedures that mirror, in many respects, the statutory requirements set out in ORS 163.105. For convenience, we set out the pertinent parts of ORS 163.105 again here:

"Notwithstanding the provisions of ORS chapter 144 [relating to parole and work release], ORS 421.165 [relating to temporary leave] and ORS 421.450 to 421.490 [relating to forest and work camps]:

"(1) When a defendant is convicted of aggravated murder as defined by ORS 163.095, the defendant shall be sentenced, pursuant to ORS 163.150, to death, life imprisonment without the possibility of release or parole or life imprisonment.

"* * * * *

"(c) If sentenced to life imprisonment, the court shall order that the defendant shall be confined for a minimum of 30 years without possibility of parole, release on work release or any form of temporary leave or employment at a forest or work camp.

"(2) At any time after 20 years from the date of imposition of a minimum period of confinement pursuant to paragraph (c) of subsection (1) of this section, the State Board of Parole and Post-Prison Supervision, upon the petition of a prisoner so confined, shall hold a hearing to determine if the prisoner is likely to be rehabilitated within a reasonable period of time. The sole issue shall be whether or not the prisoner is likely to be rehabilitated within a reasonable period of time. * * *.

"(3) If, upon hearing all of the evidence, the board, upon a unanimous vote of all five members, finds that the prisoner is capable of rehabilitation and that the terms of the prisoner's confinement should be changed to life imprisonment with the possibility of parole, or work release, it shall enter an order to that effect and the order shall convert the terms of the prisoner's confinement to life imprisonment with the possibility of parole or work release. Otherwise, the board shall deny the relief sought in the petition.

20

"(4) Not less than two years after the denial of the relief sought in a petition under this section, the prisoner may petition again for a change in the terms of confinement. Further petitions for a change may be filed at intervals of not less than two years thereafter."

Subsection (1) of ORS 163.105 is a directive to the Judicial Branch delineating three potential sentences that a trial court could impose for the crime of aggravated murder: death, life imprisonment without the possibility of parole (known as "true life"), and life imprisonment. For those defendants convicted of aggravated murder and sentenced by the trial court to life imprisonment, ORS 163.105(1)(c) further requires that the trial court order the defendant to serve a mandatory minimum sentence of 30 years without the possibility of parole or work release.

As we already have discussed, at the time that Engweiler and Sopher committed their crimes, those sentencing options applied only to adult aggravated murderers. That is so, because another statute, ORS 161.620, limited the trial courts' sentencing options for juvenile offenders. Again, for convenience, we set out ORS 161.620 here:

"*Notwithstanding any other provision of law*, a sentence imposed upon any person remanded from the juvenile court under [*former*] ORS 419.533 [(1989)] shall not include any sentence of death or life imprisonment *without the possibility of release or parole* nor imposition of any mandatory minimum sentence except that a mandatory minimum sentence under ORS 163.105(1)(c) shall be imposed where the person was 17 years of age at the time of the offense."

(Emphasis added.) Also, as explained earlier, this court has stated that the "notwithstanding" clause in that statute means that the terms of ORS 161.620 "prevail[] 'over any other provision of law,'" *Engweiler V*, 343 Or at 544, including, as relevant in

21

this case, ORS 163.105. ORS 161.620 provides that no juvenile can be sentenced to death or true life. In addition, for those juveniles who were under the age of 17 when they committed their crimes, ORS 161.620 prohibited the trial courts from imposing any statutorily required minimum sentence. *See State v. Jones*, 315 Or 225, 230-31, 844 P2d 188 (1992) (so holding). Those provisions, taken together, meant that "the only sentencing option available [to the trial court for juveniles convicted of aggravated murder] was life imprisonment with the possibility of release or parole." *Engweiler IV*, 340 Or at 383.

The remaining subsections of ORS 163.105 provide a procedure under which the board may override a 30-year mandatory minimum sentence imposed by the trial court under subsection (1). *See Janowski/Fleming v. Board of Parole*, 349 Or 432, 446, 245 P3d 1270 (2010) (ORS 163.105 gave board authority to override 30-year mandatory minimum sentence for aggravated murder and to consider releasing a prisoner on parole after 20 years upon a finding that he is likely to be rehabilitated). Specifically, subsection (2) provides that a prisoner serving a 30-year mandatory minimum sentence for aggravated murder may seek a "hearing to determine if [he] is likely to be rehabilitated within a reasonable period of time," and it describes the timing for such a hearing: "any time after 20 years from the date of imposition of a minimum period of confinement pursuant to paragraph (c) of subsection (1) of this section." If the board unanimously finds that a prisoner is "capable of rehabilitation," then the board, pursuant to subsection (3) "shall convert the terms of the prisoner's confinement to life imprisonment with the possibility of parole." Finally, subsection (4) provides a

22

mechanism for a prisoner who was unsuccessful in persuading the board to convert his mandatory minimum sentence to a sentence of life in prison with the possibility of parole to petition again after two years for "a change in the terms of confinement."

As the wording of those subsections make plain, they have no applicability to a prisoner who is not serving a mandatory minimum sentence. First, as this court stated in *Severy/Wilson v. Board of Parole*, 349 Or 461, 475, 245 P3d 119 (2010):

> "[u]nder the plain words of [ORS 163.105(2)], the trigger for the rehabilitation hearing is the 'imposition' of [a] minimum period of confinement. Only a court 'imposes' a sentence in a criminal case."

Thus, for juvenile aggravated murderers, the "trigger" for the rehabilitation hearing never occurred; ORS 161.620 prohibited trial courts from imposing a minimum period of confinement. Moreover, although the "sole issue" to be decided at the hearing described in ORS 163.105(2) to (4) is "whether or not the prisoner is likely to be rehabilitated in a reasonable period of time," ORS 163.105(2), the *only* authority that the legislature granted to the board upon its finding that the prisoner was capable of rehabilitation was to perform an act that is entirely unnecessary in the case of juvenile aggravated murderers: to change the terms of the prisoner's confinement from a prohibition on eligibility for parole to the possibility of parole. *See Severy/Wilson*, 349 Or at 477 (in requiring board to convert terms of prisoner's confinement to life with the possibility of parole, ORS 163.105(3) required the board to convert prohibition on eligibility for parole to possibility of parole). Juvenile aggravated murderers need no such change; they are "entitled to the possibility of parole" from the time that the trial court imposed its sentence of life in prison. *See Engweiler V*, 343 Or at 545 (juvenile aggravated murderers are "entitled to

23

the possibility of parole"). Finally, ORS 163.105(4) indicates that the very purpose of a prisoner's petition for that hearing is to obtain that change from prohibition to eligibility for parole:

> "Not less than two years after the denial of the relief sought in a petition under this section, the prisoner may petition again for a change in the terms of confinement."

It is clear from the foregoing that the relief that the prisoner seeks in demonstrating rehabilitation at a hearing under ORS 163.105(2) to (4) is the conversion of the prisoner's mandatory minimum sentence to life with the possibility of parole. That relief is pointless in the case of a prisoner already serving a sentence of life imprisonment with the possibility of parole.[12] It follows that ORS 163.105(2) to (4) are not applicable

---

[12] The board argues that that conversion of the prisoner's sentence to life with the possibility of parole would not be pointless in the case of prisoners not serving a mandatory minimum sentence, because, in its view, a "life sentence" does not include the possibility of parole. Therefore, *all* prisoners serving "life sentences," including juvenile aggravated murderers, can be required to undergo a rehabilitation hearing before becoming eligible for parole. Further, the board argues, while it is true that juvenile aggravated murderers must have the *eventual* possibility of parole, that does not mean that the board is precluded from requiring whatever procedure it desires, on whatever timeline, before considering juvenile aggravated murderers for parole.

We disagree. Prisoners with indeterminate sentences generally were eligible for parole consideration soon after their admission to prison. *See* ORS 144.120 (requiring the board to conduct parole hearings and set parole release dates for most prisoners within a year of their incarceration). And, as we observed in *Janowski/Fleming*, 349 Or at 449, aggravated murderers who have demonstrated that they are capable of rehabilitation and who have had their sentences converted to life with the possibility of parole are in the same position respecting parole eligibility as any other offender who was sentenced to life imprisonment by the trial court at the time of his conviction. That is, they are entitled to parole consideration at a parole hearing. *Id.* at 456. Juvenile aggravated murderers also serve indeterminate life sentences and, as we

24

to juvenile aggravated murderers.[13]

ORS 144.110(2)(b), which provides that the board "shall not release a prisoner on parole who has been convicted of * * * aggravated murder * * * except as provided in ORS 163.105" is not inconsistent with that conclusion. We acknowledge that that paragraph appears, superficially, to support the notion that all aggravated murderers, including juveniles, can be released on parole only in compliance with ORS 163.105. However, when that paragraph is considered in context, it is clear that that paragraph

discuss in more detail below, they, too, are eligible for a parole hearing and parole consideration under ORS 144.120.

[13]     The Court of Appeals reached a contrary conclusion, determining that the references to converting the terms of the prisoners' confinement were "redundant," and concluding that accepting a measure of redundancy is preferable to "hold[ing] that some portion of a statute simply does not mean what it says." *Engweiler VI*, 232 Or App at 228. The Court of Appeals erred in two respects. First, redundancy is a (perhaps unnecessary) repetition of terms; it does not refer to terms that are inapplicable to a given situation. Thus, from the point of view of juvenile aggravated murderers who are serving sentences of life imprisonment with the possibility of parole, ORS 163.105 is not *redundant* when it refers to the conversion of the terms of a prisoner's confinement from a prohibition on eligibility for parole to the possibility of parole; rather, it is *inapplicable*. The Court of Appeals' second error was in viewing the principal focus of ORS 163.105(2) to (4) as on "the board's obligation to determine the offender's rehabilitation status," and the conversion of the terms of confinement as a "superfluity." *Id.* at 229. As we discuss in the text, the words of ORS 163.105(2) to (4) belie that interpretation. Although the issue to be decided at the rehabilitation hearing is the offender's rehabilitation, the board's *obligation* is to convert the terms of the prisoner's confinement. ORS 163.105(3) (if the board finds the prisoner to be capable of rehabilitation, the board "shall enter an order to that effect and the order shall convert the terms of the prisoner's confinement to life imprisonment with the possibility of parole or work release"). And, as we also discuss in the text, the fact that subsection (4) refers to the prisoner's right to petition again for a change in the terms of his confinement after two years if he is unsuccessful the first time demonstrates that the conversion of the sentence is not a superfluity; it is the *purpose* of the prisoner's petition.

bolsters, rather than undermines, our conclusion that ORS 163.105 is inapplicable to

juvenile aggravated murders.

ORS 144.110 provides as follows:

"(1) In any felony case, the court may impose a minimum term of imprisonment of up to one-half of the sentence it imposes.

"(2) Notwithstanding the provisions of ORS 144.120 [dealing with release on parole according to matrix] and 144.780 [directing board to adopt rules establishing matrix]:

"(a) The board shall not release a prisoner on parole who has been sentenced under subsection (1) of this section until the minimum term has been served, except upon affirmative vote of at least four members of the board.

"(b) The board shall not release a prisoner on parole who has been convicted of murder defined as aggravated murder under the provisions of ORS 163.095, except as provided in ORS 163.105."

That statute "deals with restrictions on paroling persons who have been sentenced to

minimum terms." *Janowski/Fleming*, 349 Or at 443. As this court explained in

*Janowski/Fleming*, ORS 144.110 has two parts. The first part grants trial courts

discretion to impose minimum periods of imprisonment for adults convicted of felonies

other than aggravated murder. *Janowski/Fleming*, 349 Or at 443. As noted, such

discretion generally is unnecessary for aggravated murderers; under ORS 163.105, the

trial court must impose a 30-year mandatory minimum sentence for aggravated murder (if

the defendant was not given the death penalty or true life). And, as this court further

explained in *Janowski/Fleming*, the second part

"set out two processes for effectively overriding those mandatory minimum sentences. The processes were parallel, a fact demonstrated by their use of identical wording in paragraphs (2)(a) and (2)(b), *viz.*, 'The board shall not release a prisoner on parole * * * except * * *.' Under paragraph (2)(a), in

26

cases in which the court had imposed mandatory minimum sentences for felonies other than aggravated murder, the board had the authority to override those mandatory minimum sentences if four of the five board members agreed. Paragraph (2)(b), which prohibited the board from releasing on parole a prisoner who had been convicted of aggravated murder 'except as provided in ORS 163.105,' gave the board similar authority, albeit with more onerous preconditions: In the case of prisoners convicted of aggravated murder, the prisoner was not permitted to seek a rehabilitation hearing that might lead to an override of the prisoner's judicially imposed sentence until he already had been incarcerated for 20 years, the burden was on the prisoner to convince the board that he was likely to be rehabilitated within a reasonable time, and the board was required to agree with the prisoner unanimously rather than by a four-of-five member vote. ORS 163.105(2), (3)."

*Janowski/Fleming*, 349 Or at 443-44 (footnote omitted). In context, and read together with ORS 163.105, it is clear that ORS 144.110(2)(b) refers to a process for overriding the mandatory minimum sentence required to be imposed for aggravated murder, parallel to the process set out in subparagraph (2)(a) for overriding the mandatory minimum sentence that the trial court, in its discretion, has imposed for other types of felonies. Those parallel processes for overriding mandatory minimum sentences have no bearing on the board's parole release decisions respecting prisoners who are *not* serving mandatory minimum sentences. And because, under ORS 161.620, trial courts were not permitted to impose minimum sentences on juveniles, it follows that the process referred to in ORS 144.110(2)(b) has no applicability to juvenile aggravated murderers.[14]

---

[14]    The dissent disagrees with our conclusion that ORS 144.110(2)(b) and ORS 163.105 have no applicability to juvenile aggravated murderers. In the dissent's view, ORS 144.110(2)(b) is the "only * * * statute [that] serves as the potential source for the board's power to parole any aggravated murderer, adult or juvenile," __ Or __ (Linder, J., dissenting) (slip op at 3), because the board's *general* authority to parole inmates was

27

limited, under ORS 144.050, to inmates who committed their offenses prior to November 1, 1989. *Id.* at __ (slip op at 6). Therefore, according to the dissent, to the extent that we conclude that neither ORS 144.110 nor ORS 163.105 applies to juvenile aggravated murderers, we also must conclude that the board lacks authority to parole juvenile aggravated murderers at all. *Id.* at __ (slip op at 7).

The dissent errs in two ways. First, ORS 144.110(2)(b) is not the only "potential source for the board's power to parole" juvenile aggravated murderers. The dissent reaches that erroneous conclusion because it reads in isolation, and therefore places too much emphasis on, one phrase in ORS 144.110(2)(b): "*[t]he board shall not release a prisoner on parole * * * except*" as provided in ORS 163.105. Context establishes that the legislature did not intend that phrase as a grant of authority to the board to release any prisoner on parole. Rather, as we discuss in the text, *both* ORS 144.110(2)(a) *and* ORS 144.110(2)(b) are merely restrictions on paroling persons who have been sentenced to minimum terms. ORS 144.110(2)(a) provides that, when a trial court has imposed a mandatory minimum sentence for a felony other than aggravated murder, a majority vote of the board is required to override that mandatory minimum. In a parallel fashion, ORS 144.110(2)(b) provides that, when the trial court has imposed a 30-year mandatory minimum sentence for aggravated murder, the board must follow the procedures set out in ORS 163.105 to override that mandatory minimum.

Our conclusion that ORS 144.110(2)(b) is merely an override provision is bolstered by the fact that ORS 163.105 only addresses the conversion of a prisoner's 30-year mandatory minimum sentence to a sentence of life imprisonment with the possibility of parole; it does not authorize or provide a mechanism for the board to *release* any prisoner on parole. *See Janowski/Fleming*, 349 Or at 446 (ORS 163.105 silent with respect to how the board was expected to determine a prisoner's actual duration of confinement once board converted prisoner's term to life with the possibility of parole). And, as previously stated, juvenile aggravated murderers never were sentenced to minimum terms; therefore, no override under ORS 144.110 or conversion under ORS 163.105 is necessary.

The fact that ORS 144.110 is not a source of the board's parole authority does not mean, however, that the board lacks authority to parole juvenile (or adult) aggravated murderers. It is true, as the dissent observes, that ORS 144.050 (1989) grants the board express authority to parole only those inmates who committed offenses prior to November 1, 1989. However, as we discuss in the text below, the legislative note following ORS 144.110 (enacted at the same time as the amendment to ORS 144.050 limiting the board's parole authority to offenders who committed crimes after November 1, 1989) explicitly provides that ORS 144.110, 144.120, and several other statutes, all governing the board's authority to release prisoners on parole, continue to apply to

28

Our conclusions respecting the applicability of ORS 163.105(2) to (4) and ORS 144.110(2)(b) to juvenile aggravated murderers constitute the first step in the resolution of Sopher's petition for review of the Court of Appeals decision in the rule challenge case. That is, because we hold that ORS 144.110 and ORS 163.105 do not apply to juvenile aggravated murderers, it necessarily follows that neither of those statutes provide authority to the board to require, under the JAM rules, that a juvenile aggravated murderer undergo an intermediate review process to demonstrate that he is capable of rehabilitation before he is deemed eligible for parole consideration. Therefore, before turning to the other issues presented in these cases, we complete our analysis in the rule challenge.[15]

---

prisoners who have been convicted of aggravated murder, regardless of the date of their crimes. That legislative note, then, effectively operates as an exception to the date limitation in ORS 144.050 on the board's parole authority, permitting it to continue to exercise that authority over prisoners convicted of aggravated murder after November 1, 1989. In other words, notwithstanding its apparently limiting wording, ORS 144.050 continues to be the source of the board's parole authority over aggravated murderers.

[15] As a preliminary matter, we acknowledge, as the board has pointed out, that this court considered, in *Engweiler V*, whether the board had exceeded its statutory authority in promulgating the JAM rules. In that case, Engweiler argued that the JAM rules exceed the board's authority because they ran afoul of ORS 144.780(1) (1997), which directed the board to "adopt rules establishing ranges of duration of imprisonment to be served for felony offenses prior to release on parole." Engweiler argued that that statute obligated the board to establish a "duration of imprisonment" at a juvenile aggravated murderer's initial prison term hearing, but the JAM rules do not permit setting an actual parole release date at a prison term hearing. This court held that Engweiler had misread ORS 144.780; that statute required only that the board adopt "ranges" of duration of imprisonment, which it did when it adopted the exhibits attached to the rules. *Engweiler V*, 343 Or at 550. It did not require the board to establish a particular duration of imprisonment for any particular prisoner. Accordingly, the court held, the JAM rules

29

As discussed above, in a rule challenge under ORS 183.400, judicial review is

> "limited to an examination of: (a) [t]he rule under review; (b) [t]he statutory provisions authorizing the rule; and (c) [c]opies of all documents necessary to demonstrate compliance with applicable rulemaking procedures."

ORS 183.400(3). Moreover, a court may declare a rule invalid

> "only if it finds that the rule: (a) [v]iolates constitutional provisions; (b) [e]xceeds the statutory authority of the agency; or (c) [w]as adopted without compliance with applicable rulemaking procedures."

ORS 183.400(4). Sopher has not challenged the JAM rules on the ground that the board failed to comply with applicable rulemaking procedures. He does, however, challenge the rules on the grounds that they exceeded the board's statutory authority and that they violated certain constitutional provisions. Consistent with this court's preferred practice in dealing with legal challenges to administrative rules under ORS 183.400, we consider statutory questions before turning to constitutional issues. *Oregon Newspaper Publishers v. Dept. of Corrections*, 329 Or 115, 119, 988 P2d 359 (1999) (so holding).

---

did not conflict with ORS 144.780(1) (1997), and the board, therefore, did not exceed its statutory authority in any way argued by Engweiler in that case. *Id*. at 551 ("ORS 144.780(1) (1997) is not offended by [the] procedural choice on the board's part [to conduct an intermediate hearing before setting a parole release date].").

In *Engweiler V*, this court was not asked to, and did not, address the precise issue that the court confronts today, *viz*., whether the board exceeded its statutory authority in adopting the JAM rules because no statute authorizes the board to require juvenile aggravated murderers to undergo an intermediate review process before the board considers them for parole eligibility and other statutes require the board to conduct parole hearings and set parole release dates for them.

30

The JAM rules consist of the 1999 amendments to OAR 255-032-0005, OAR 255-032-0010, OAR 255-032-0015, and OAR 255-032-0020, as well as the then-newly adopted OAR 255-032-0011 and certain exhibits setting out the matrix ranges for juvenile aggravated murderers. OAR 255-032-0005, OAR 255-032-0010, OAR 255-032-0015, and OAR 255-032-0020 were amended to add the word "adult" in various places, to clarify when juveniles were excluded from the review process outlines in those rules. In addition, OAR 255-032-0005 was amended to include the following:

"(4) Inmates, who were juveniles and waived to the adult court pursuant to ORS 419C.340 through 419C.364, and were under the age of 17 years at the time of their crime(s), and were convicted of Aggravated Murder, per ORS 163.095, and whose crimes were committed after October 31, 1989 and prior to April 1, 1995, shall receive a prison term hearing. At the hearing, the Board shall set a review date consistent with the terms set forth in OAR 255-032-0011, rather than a projected parole release date."

OAR 255-032-0011 provides:

"(1) The Board shall conduct a hearing pursuant to OAR 255-030-0013, 255-030-0015, 255-030-0021, 255-030-0023 and 255-030-0025 through 255-030-0055.

"(2) The Board shall set a review date pursuant to Exhibit P-III, or deny parole, pursuant to OAR 255-035-0030.

"(3) The method established by sections (1) to (3) of OAR 255-035-0021 shall not apply to inmates described in 255-032-0005(4). To determine the unified range for inmates described in OAR 255-032-0005(4) with consecutive sentences for aggravated murder, the Board shall establish the matrix range for each crime by using the inmate's history/risk score pursuant to Exhibit P-III. The unified range shall be the sum of the ranges established under this section.

"(4) The Board may depart from the appropriate matrix range for inmates described in OAR 255-032-0005(4) only upon making a specific finding that there is aggravation or mitigation which justifies departure from the range pursuant to Exhibits E-1 and E-2. The Board shall clearly state on the record the facts and specific reasons for its finding. The Board

31

may give items of aggravation and mitigation different weight and not necessarily balance them one for one. Exhibit D does not apply to inmates described in 255-032-0005(4). The Board cannot apply aggravating or mitigating factors to adjust an inmate's matrix range more than one level up or down. Mitigating factors cannot reduce an inmate's matrix range below the lowest possible range on the matrix.

"(5) If the Board denies parole, the inmate may petition for review after 480 months from the adjusted inception date. If the Board determines, following a review of the inmate's petition and institutional record, there is reasonable grounds to believe that rehabilitation may have occurred and that the possibility of parole should be considered, a review hearing shall be scheduled.

"(6) If the Board sets a review date pursuant to Exhibit P-III, the Board shall conduct a progress review five years prior to the established review date. The progress review does not require a hearing with the inmate; however, the inmate may submit materials to be considered. The purpose of the progress review is to determine the inmate's institutional conduct and rehabilitation efforts since the prison term hearing.

"(7) The Board may determine a parole release date or future review dates any time after the established review date. The Board may order a psychological evaluation. Refusal to submit to an evaluation if one is ordered will be grounds for automatic deferral of the hearing for up to five years or a lesser time if deemed appropriate by the Board. If parole was previously denied, that decision will remain in effect and further petitions for review will not be considered at less than two (2) year intervals.

"(8) At the review hearing, the Board will consider, but is not limited to, the following:

"[various indicia of rehabilitation] * * *.

"The decision for the Board shall be whether there are significant indications of reformation and rehabilitation such that the offender does not represent a risk to the community and that it is in the offender's and the community's best interest that he/she be released to the community under conditions of supervision.

"If the Board does not make the above finding, the Board shall set a subsequent review hearing date not to exceed five (5) years from the present review."

32

Exhibit P-III, referred to in the foregoing rule, sets out the juvenile aggravated murder matrix.

Again as noted, in promulgating the JAM rules, the board cited four sources of statutory authority:  ORS 144.110(2)(b) (1997), ORS 163.105(1) (1997), 161.620 (1994), and ORS 144.780 (1997).  Sopher argues that the board promulgated the JAM rules based on a misunderstanding of the relevant laws and, as a consequence, it created rules that "depart[] from the legal standard expressed or implied in the enabling statute[s]," quoting *Gilliam County v. Dept. of Environmental Quality*, 316 Or 99, 106, 849 P2d 500 (1993), *rev'd on other grounds sub nom Oregon Waste Sys. v. Department of Environmental Quality*, 511 US 93, 114 S Ct 1345, 128 L Ed 2d 13 (1994). Specifically, Sopher argues that neither ORS 163.105(1), which provides three sentencing options for adult aggravated murderers (none of which may be imposed on juvenile aggravated murderers), nor any other part of ORS 163.105, gives the board authority to impose the intermediate review procedure outlined ORS 163.105 to juvenile aggravated murderers.  Similarly, Sopher argues, ORS 144.110(2)(b) provides the board with no such authority.  As already discussed at length, we agree on both counts.

Sopher also argues that neither ORS 161.620 nor ORS 144.780 provides a source of authority for requiring juvenile aggravated murderers to prove rehabilitation before becoming eligible for parole release.  We agree.  As discussed above, ORS 161.620 is a limitation on the options available to the trial court in sentencing juvenile felony offenders in general, and specifically, juvenile aggravated murderers under the age of 17 at the time of their offense.  That statute has no application to the authority of the

33

board (a separate branch of government) to make parole release decisions for juvenile aggravated murderers. Likewise, ORS 144.780, which directs the board to "adopt rules establishing ranges of duration of imprisonment to be served for felony offenses prior to release on parole," cannot be read to authorize the board to require juvenile aggravated murderers to undergo an intermediate review process before becoming eligible for parole release.[16]

At the same time, Sopher argues, ORS 144.120(1)(a) requires the board to conduct a parole hearing and set a parole release date, and the JAM rules, by setting review dates rather than release dates, conflict with that statute. As discussed above, the 1989 version of ORS 144.120(1)(a) provided as follows:

> "Within six months of the admission of a prisoner to any Department of Corrections institution, with the exception of those prisoners sentenced to a term of imprisonment for life or for more than five years, the board shall conduct a parole hearing to interview the prisoner and set the initial date of release on parole pursuant to subsection (2) of this section. For those prisoners sentenced to a term of imprisonment for more than five years but less than 15 years, the board shall conduct the parole hearing and set the initial date of release within eight months following admission of the prisoner to the institution. *For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution.* Release shall be contingent upon satisfaction of the requirements of ORS 144.125."

(Emphasis added.)

We conclude that that statute required the board to conduct a parole hearing

---

[16] Of course, as noted above in note 15, this court held in *Engweiler V* that ORS 144.780 also did not operate as an impediment to the promulgation of such rules.

34

for offenders sentenced to life in prison within one year after an offender's admission to prison, even if the offender had been convicted of aggravated murder. The statute uses the mandatory word "shall" and contains no exceptions depending on the nature of the crime committed.[17] Therefore, we conclude that the JAM rule requirement that a juvenile aggravated murderer undergo an intermediate hearing no less than 20 years after his admission to prison before he is eligible for parole consideration is in direct conflict with ORS 144.120(1)(a) (1989).

However, in 1991, before Sopher committed his crime, the legislature added a phrase to ORS 144.120, amending the wording in paragraph (1)(a) that is italicized above to read as follows:

> "For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, *with the exception of those sentenced for aggravated murder*, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution."

Or Laws 1991, ch 126, § 6 (emphasis added). As noted, the trial court in Sopher's mandamus case, and the Court of Appeals in *Sopher III*, concluded that that wording

---

[17] We recognize that another subsection of ORS 144.120 -- ORS 144.120(4) -- gives the board the authority to choose not to set a parole release date for, among others, prisoners "whose offense included particularly violent or otherwise dangerous criminal conduct." We need not decide today whether the board may invoke that subsection to choose not to set a parole release date for prisoners who committed juvenile aggravated murder, an offense that inherently "included particularly violent or otherwise dangerous criminal conduct."

meant that, after 1991, aggravated murderers were not entitled to a parole hearing.[18]

Sopher argues, to the contrary, that the exception for aggravated murderers added to ORS 144.120(1)(a) in 1991 applies only to the *timing* of parole hearings, not to the requirement that the board conduct such hearings at all. That is, Sopher argues, the amendment removed the requirement that the board conduct parole hearings *within one year of an aggravated murderer's admission to prison*, but ORS 144.120(1)(a) (1991) continued to mandate that the board conduct such hearings for aggravated murderers *at some point*.[19]

---

[18]     In *Engweiler III*, this court reached a similar conclusion. There, the court stated that,

> "under that [1991] version of ORS 144.120(1)(a) * * *, the board was not required to set an initial release date for prisoners who, like petitioner, had been sentenced to aggravated murder. * * * [N]o * * * statute required the board to set an initial release date for persons like petitioner."

340 Or at 368-69. Those statements in *Engweiler III* were *dicta*, because Engweiler had argued that the version that was in effect when he committed his crime -- the 1989 version -- was the version that applied in his case, and the board conceded that point for purposes of argument there. In summarizing ORS 144.120(1)(a) (1991) in the way that it did, this court did not analyze the context of that wording or consider its legislative history. As we explain below, we no longer agree with the court's statement -- at least as it implicitly suggests that ORS 144.120(1)(a) (1991) requires the board neither to conduct a parole hearing, nor to set a release date, for any prisoner convicted of juvenile aggravated murder. And, in light of the fact that the court's comments are *dicta*, we are not bound by them.

[19]     The board conceded Sopher's point in this regard at oral argument in this court. That is, the board has conceded that the exclusion for aggravated murderers that the legislature added to ORS 144.120(1)(a) in 1991 means only that the board need not conduct a parole hearing for aggravated murderers *within one year of their admission to prison*; ORS 144.120(1)(a) (1991) continued to require a parole hearing for all aggravated murderers, including juvenile aggravated murderers, *at some point*. In this

36

In interpreting a statute, our task is to attempt to discern the intent of the legislature. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009) (discerning the intent of the legislature is the court's "paramount goal" in statutory interpretation). We begin by considering the text and context of the statute. *Id.* We then turn to any pertinent legislative history that the parties have offered. *Id.* at 172.

We agree that the text of ORS 144.120 is ambiguous and capable of two plausible interpretations. It is not clear from the text alone whether the legislature intended the 1991 addition of the words "with the exception of those sentenced for aggravated murder" to exclude all aggravated murderers from a parole hearing, or merely to except them from the requirement that the hearing be held within one year of the prisoner's admission to prison. Context, however, suggests that the legislature intended to except aggravated murderers from the timing requirement only.

The first contextual clue is in the legislative note that follows ORS 144.110, which states that

"Section 28, chapter 790, Oregon Laws 1989 provides:

"Sec. 28. The provisions of ORS 144.110, 144.120, 144.122, 144.125, 144.130, 144.135, 144.185, 144.223, 144.245,144.270 and 144.305 apply only to offenders convicted of a crime committed prior to November 1, 1989, and to offenders convicted of aggravated murder or murder regardless of the date of the crime."

That note explicitly provides that ORS 144.120 continues to apply to prisoners who have

court, the board's only argument is that the board is required to conduct a rehabilitation hearing for *all* aggravated murderers, including all juvenile aggravated murderers, under ORS 163.105 before conducting the parole hearing required by ORS 144.120(1)(a).

37

been convicted of aggravated murder, "regardless of the date of the crime." That means that ORS 144.120 (1991) applied to Sopher, who committed his crime in 1992. All parts of ORS 144.120 (1991) deal with the prisoner's entitlement to a parole hearing and the setting of initial release dates,[20] and the only part of ORS 144.120 (1991) that specifically

---

[20]     ORS 144.120 (1991) provided:

"(1)(a) Within six months of the admission of a prisoner to any Department of Corrections institution, with the exception of those prisoners sentenced to a term of imprisonment for life or for more than five years, the board shall conduct a parole hearing to interview the prisoner and set the initial date of release on parole pursuant to subsection (2) of this section. For those prisoners sentenced to a term of imprisonment for more than five years but less than 15 years, the board shall conduct the parole hearing and set the initial date of release within eight months following admission of the prisoner to the institution. For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, with the exception of those sentenced for aggravated murder, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution. Release shall be contingent upon satisfaction of the requirements of ORS 144.125.

"(b) Those prisoners sentenced to a term of imprisonment for less than 15 years for commission of an offense designated by rule by the board as a non person-to-person offense may waive their rights to the parole hearing. When a prisoner waives the parole hearing, the initial date of release on parole may be set administratively by the board pursuant to subsections (2) to (6) of this section. If the board is not satisfied that the waiver was made knowingly or intelligently or if it believes more information is necessary before making its decision, it may order a hearing.

"(2) In setting the initial parole release date for a prisoner pursuant to subsection (1) of this section, the board shall apply the appropriate range established pursuant to ORS 144.780. Variations from the range shall be in accordance with ORS 144.785.

"(3) In setting the initial parole release date for a prisoner pursuant to subsection (1) of this section, the board shall consider the presentence

38

investigation report specified in [*former*] ORS 144.790 or, if no such report has been prepared, a report of similar content prepared by the Department of Corrections.

"(4) Notwithstanding subsection (1) of this section, in the case of a prisoner whose offense included particularly violent or otherwise dangerous criminal conduct or whose offense was preceded by two or more convictions for a Class A or Class B felony or whose record includes a psychiatric or psychological diagnosis of severe emotional disturbance such as to constitute a danger to the health or safety of the community, the board may choose not to set a parole date.

"(5) After the expiration of six months after the admission of the prisoner to any Department of Corrections institution, the board may defer setting the initial parole release date for the prisoner for a period not to exceed 90 additional days pending receipt of psychiatric or psychological reports, criminal records or other information essential to formulating the release decision.

"(6) When the board has set the initial parole release date for a prisoner, it shall inform the sentencing court of the date.

"(7) The State Board of Parole and Post-Prison Supervision must attempt to notify the victim, if the victim requests to be notified and furnishes the board a current address, and the district attorney of the committing county at least 30 days before all hearings by sending written notice to the current addresses of both. The victim, personally or by counsel, and the district attorney from the committing jurisdiction shall have the right to appear at any hearing or, in their discretion, to submit a written statement adequately and reasonably expressing any views concerning the crime and the person responsible. The victim and the district attorney shall be given access to the information that the board or division will rely upon and shall be given adequate time to rebut the information. Both the victim and the district attorney may present information or evidence at any hearing, subject to such reasonable rules as may be imposed by the officers conducting the hearing. For the purpose of this subsection, 'victim' includes the actual victim, a representative selected by the victim, the victim's next of kin."

39

addresses aggravated murderers is the disputed provision in ORS 144.120(1)(a). An interpretation of ORS 144.120(1)(a) (1991) that entirely exempts aggravated murders from the hearing requirement would directly conflict with the legislative note. The only way to give effect to both provisions is to read ORS 144.120(1)(a) as Sopher suggests: the exception for those convicted of aggravated murder applies only to the timing of the parole hearing; in the case of aggravated murderers, it need not be conducted within one year of the prisoner's admission to prison. The exception does not mean that aggravated murderers are not entitled to a parole hearing at all. That interpretation is consistent with the directive in ORS 161.620, which, as this court stated in *Engweiler V*, requires that juvenile aggravated murderers "must be entitled to the possibility of parole." 343 Or at 545.

Likewise, ORS 163.105 also provides relevant context. As we explained above, that statute provides that adult aggravated murderers who have been sentenced to life in prison with a 30-year mandatory minimum term of incarceration may have their sentences converted after 20 years to life in prison with the possibility of parole if they demonstrate to the board that they are capable of rehabilitation. And, as this court recently held in *Janowski/Fleming*, prisoners whose sentences are so converted are then immediately entitled to parole consideration. 349 Or at 456. If we were to read the 1991 amendments to wholly eliminate aggravated murder from the provisions of ORS 144.120,

40

then there is no statutory authority for the board to set an initial release date for aggravated murderers entitled to parole consideration under ORS 163.105. That is so, because ORS 163.105 does not authorize the board to take any action relating to a parole release date; the board's sole directive in that statute is to "convert the terms of the prisoner's confinement to life imprisonment with the possibility of parole or work release." ORS 163.105(3). It is highly doubtful that the legislature intended to leave the board without statutory authority to conduct parole hearings for aggravated murderers whose mandatory minimum sentences have been converted to indeterminate sentences and who become eligible for parole pursuant to ORS 163.105.

Finally, we find further contextual support for our interpretation of ORS 144.120(1)(a) (1991) in that there is no practical reason to have a parole hearing after one year for most aggravated murderers, who are required, under ORS 163.105, to serve at least 20 years in prison before becoming eligible for parole. Any requirement to conduct a hearing and set an initial release date after only one year would be premature.

Legislative history suggests that the legislature contemplated that practical concern when it adopted the 1991 amendment. That amendment was enacted from House Bill 2603. When the House Subcommittee on Criminal Law and Corrections met to consider that bill, Representative Rod Johnson asked the then-Chairman of the Board of Parole, Vern Faatz, the purpose of the amendment. Faatz replied:

> "There are three categories for aggravated murder: aggravated murder with the death penalty (the Board has no function with that); aggravated murder without parole (the Board has no function with that); and then aggravated murder with parole. The Board has no real up front prison term setting responsibility. We have, at the end of 20 years, a requirement of a review

41

and consideration of parole, if it's determined the person can be rehabilitated at a future date[.]"

Tape Recording, House Committee on Judiciary, Subcommittee on Criminal Law and Corrections, HB 2603, Mar 5, 1991, Tape 40, Side A (statement of Vern Faatz). That statement suggests that the legislature viewed its purpose in amending ORS 144.120(1)(a) as an acknowledgement of the fact that there was no need to conduct a parole hearing for aggravated murderers within one year of their admission to prison when they would not be eligible for parole consideration for at least 20 years.[21]

Considering all of the foregoing together, we conclude that the legislature intended that ORS 144.120(1)(a) (1991) apply to juvenile aggravated murderers and required the board to conduct parole hearings for juvenile aggravated murderers. That is, although it is possible to read the phrase as excluding aggravated murderers from the parole hearing process set out in ORS 144.120, we are persuaded by context and legislative history that the disputed phrase -- "with the exception of those sentenced for aggravated murder" -- merely removes "those sentenced for aggravated murder" from the requirement that a parole hearing be held within one year of the prisoners' admission to prison, and that the legislature did not intend to eliminate the board's authority to conduct a parole hearing for them altogether.

---

[21]    It is notable that juvenile aggravated murderers were not mentioned in the hearing, and the legislature apparently did not consider the possibility that ORS 163.105 did not apply to juveniles or that, under ORS 161.620, juvenile aggravated murderers were eligible for parole consideration immediately upon admission to prison.

To summarize, we find nothing in the statutes that the board has cited as authority for the JAM rules that can be read to authorize the board to require juvenile aggravated murderers to undergo an intermediate hearing process before they become eligible for parole consideration. ORS 144.120 (1989) and ORS 144.120 (1991) required parole hearings for all prisoners who are eligible for parole consideration. To the extent that JAM rules require juvenile aggravated murderers to undergo an intermediate process before they become eligible for parole consideration, they exceed the board's rulemaking authority and are invalid, because they conflict with the statutes requiring the board to conduct a parole hearing and set an initial release date for them, unless it declines to do so under ORS 144.120(4). The Court of Appeals erred in concluding otherwise.

We turn now to the mandamus cases. A writ of mandamus may be issued "to any inferior court, corporation, board, officer or person, to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station * * *." ORS 34.110. As this court stated in *State ex rel Dewberry v. Kulongoski*, 346 Or 260, 274, 210 P3d 884 (2009), "[a] mandamus action is a special proceeding used to compel a government official to perform a legal duty." The legal right to compel the performance of the legal duty "must be plain and complete." *Florey v. Coleman*, 114 Or 1, 2, 234 P 286 (1925). That is, "no petitioner is entitled to the remedy of mandamus unless he has a clear legal right to the performance of the particular duty sought to be enforced and unless there is a plain legal duty on the part of the defendant to perform the act." *United States of America v. Cohn*, 201 Or 680, 684, 272 P2d 982 (1954).

The question remaining to be answered in these mandamus cases is whether

43

ORS 144.120(1)(a) (1989) or ORS 144.120(1)(a) (1991) imposed on the board a legal duty to conduct a parole hearing and set a parole release date for either Engweiler, or Sopher, or both of them.

Engweiler committed his crime in 1989, although he was resentenced in 1994. Engweiler always has contended that the 1989 version of ORS 144.120(1)(a) applied to his case. Below, the board contended that, on the contrary, the version in effect at Engweiler's resentencing -- the 1991 version -- applied to Engweiler. In this court, however, the board has abandoned that argument, confining itself to arguing that ORS 144.110 and ORS 163.105, which apply "notwithstanding the provisions of ORS 144.120," mandate a different procedure for aggravated murderers. As we have explained above, ORS 163.105 and ORS 144.110 are inapplicable to prisoners who are not serving mandatory minimum sentences. That leaves ORS 144.120(1)(a) (1989). To repeat, that statute provided, in part,

> "For those prisoners sentenced to a term of imprisonment for life * * *, the board shall conduct the parole hearing, and shall set the initial release date, within one year following admission of the prisoner to the institution."

By its plain terms, ORS 144.120(1)(a) (1989) imposed a clear statutory duty on the board to conduct a parole hearing within one year of Engweiler's incarceration. The board did not do so. The board must now conduct a parole hearing for Engweiler under ORS 144.120.

Engweiler also argues that the board must set a release date for him at that hearing. However, ORS 144.120 did not impose a similar legal duty on the board to set a release date, notwithstanding the apparent directive in ORS 144.120(1)(a) to do so -- the

44

board "shall set the release date."  The board had no "plain" legal duty to set a release date, because ORS 144.120(4) provided:

> "Notwithstanding subsection (1) of this section, in the case of a prisoner whose offense included particularly violent or otherwise dangerous criminal conduct or whose offense was proceeded by two or more convictions for a Class A or Class B felony or whose record includes a diagnosis of severe emotional disturbance such as to constitute a danger to the health or safety of the community, the board may choose not to set a parole date."

Given the existence of subsection (4), we cannot say that Engweiler has a "plain and complete" legal right to compel the board to set a release date for him.  We can say, however, that the board has a legal duty under ORS 144.120 *either* to set a parole release date for Engweiler *or* to explain why it has chosen not to do so.  The trial court was correct to issue a peremptory writ of mandamus, and the Court of Appeals erred in reversing and remanding with instructions to vacate it.

However, we reach a different conclusion with regard to Sopher.  Sopher is entitled to a parole hearing under ORS 144.120(1)(a) (1991).  That statute provides:

> "For those prisoners sentenced to a term of imprisonment for life or for 15 years or more, with the exception of those sentenced for aggravated murder, the board shall conduct the parole hearing, and shall set the release date, within one year following admission of the prisoner to the institution."

As we have explained, the foregoing means that prisoners sentenced for aggravated murder are entitled to a parole hearing at which the board must either set a release date or explain why it has chosen not to do so.  The question in Sopher's case is when does that legal duty on the board's part arise?  In other words, does the board presently have a clear legal duty to conduct a parole hearing in Sopher's case, such that the extraordinary

45

remedy of mandamus is warranted?

As we have explained, although Sopher was eligible for parole consideration from the time he commenced serving his sentence, the board did not have an obligation under ORS 144.120(1)(a) (1991) to conduct a parole hearing within one year after Sopher's admission to prison, as it did for Engweiler.

Because no statute or rule directs the board to conduct a parole hearing for Sopher at any particular time, the timing of the hearing is within the board's discretion. Accordingly, the trial court and the Court of Appeals were correct in declining to issue a peremptory writ of mandamus.[22]

In summary, we hold that the board exceeded its statutory authority when it promulgated the JAM rules, requiring juvenile aggravated murderers to undergo the intermediate review process described in ORS 163.105(2) to (4) before the board makes parole release decisions respecting them. The Court of Appeals erred in holding otherwise. Each inmate is serving an indeterminate sentence of life imprisonment with the possibility of parole. The legislature provided the board with authority in ORS 144.120(1) to determine initial release on parole for inmates serving indeterminate

---

[22] In light of our decision, it is, however, appropriate to ask: Where does that leave inmate Sopher? Given that Sopher has been eligible for parole consideration from the time he began serving his sentence, his situation is more like Engweiler's than like the adult aggravated murderers who must wait at least 20 years before becoming eligible for parole consideration. Because almost 20 years already has elapsed since Sopher began serving the sentence for his crime, the board should consider conducting a parole hearing consistent with ORS 144.120(1)(a) (1991), and either set a release date for Sopher or explain why it has chosen not to do so.

sentences.  We also conclude that ORS 144.120(1) (1989) imposed on the board a legal duty to conduct a parole hearing immediately for Engweiler and to set an initial release date for him or explain why it chooses not to do so.  As to Sopher, we hold only that ORS 144.201(1) (1991) entitles him to a hearing at some point to set an initial release date.  However, as we have explained, the board has authority under the statute to determine when to hold that hearing.  We conclude, therefore, that the Court of Appeals erred in reversing the trial court's issuance of the writ of mandamus in Engweiler's mandamus action; however, we affirm the Court of Appeals decision affirming the trial court's dismissal of Sopher's mandamus action.

The decision of the Court of Appeals in *Sopher v. Board of Parole*, 233 Or App 178, 225 P3d 836 (2010) is reversed.  The decision of the Court of Appeals in *State ex rel Engweiler v. Powers*, 232 Or App 214, 221 P3d 818 (2009) is reversed and the trial court's issuance of the writ is affirmed.  The decision of the Court of Appeals in *State ex rel Sopher v. Washington*, 233 Or App 228, 225 P3d 142 (2010) is affirmed in part and vacated in part.

**LINDER, J.,** dissenting.

The issue in this case is a narrow one. It is not whether the State Board of Parole and Post-Prison Supervision has general authority to adopt rules to determine whether and when to parole juvenile aggravated murderers. Against an earlier challenge by one of these petitioners, we have already determined that the board has authority to do so. *Engweiler v. Board of Parole*, 343 Or 536, 548, 175 P3d 408 (2007). We also determined that the board appropriately exercised that authority by promulgating special rules for juvenile aggravated murderers, because the rules that the board promulgated for adult aggravated murderers did not apply. *Id.* The challenge in these consolidated cases is directed to only one aspect of the procedures that the board has adopted. Specifically, that narrow issue is whether the board was legally obligated, shortly after these juvenile aggravated murderers were sentenced to life imprisonment, to set an actual parole release date for them, or whether the board has authority to choose instead to first determine if the inmate is susceptible to rehabilitation in the foreseeable future, and set a binding release date only if the board decides that the answer is yes.

To resolve that issue, we should first look to the board's powers and responsibilities, and in particular the extent to which the legislature has delegated to the board the responsibility to decide the policies and procedures for paroling juvenile aggravated murderers. Like other executive branch agencies, the Board of Parole is a creation of the legislature. The board has no general jurisdiction or inherent authority to exercise any particular power of any kind. *See Ochoco Const. v. DLCD*, 295 Or 422, 426, 667 P2d 499 (1983) (agencies have no inherent power, but only power and authority

1

conferred on them by organic legislation); *see generally Sunshine Dairy v. Peterson*, 183 Or 305, 326-27, 193 P2d 543 (1948) (in construing statutes, agency power to act must be expressly conferred by legislature). Instead, the board derives its authority from the enabling legislation that mandates the board's functions and grants the board the powers needed to carry out those functions. *See 1000 Friends of Oregon v. LCDC*, 301 Or 622, 627, 724 P2d 805 (1986) (unless constitutional provision establishes agency's function and authority, executive branch agency derives authority principally from the enabling legislation that mandates particular agency's function and grants it power). Thus, like other executive agencies, the board's powers and responsibilities are limited to those that the legislature has expressly authorized. The board can exercise implied authority only to the extent that such authority is necessary to effectuate the board's expressly granted powers. *See Ochoco Const.*, 295 Or at 433-39 (court would not imply agency authority except to effectuate expressly granted power, regardless of policy arguments in favor of such implication); *Cabell v. City of Cottage Grove*, 170 Or 256, 272, 130 P2d 1013 (1943) (agency authority may be implied as "reasonably and necessarily incident to those expressly granted"); *Lee, Inc. v. Pac. Tel. & Tel. Co.*, 154 Or 272, 279, 59 P2d 683 (1936) (same principle applies to executive branch officials).[1]

---

[1] This court has applied essentially the same general principle -- that an agency may exercise only expressly granted authority and any powers necessarily incident to that power -- to the board. *See Severy v. Board of Parole*, 318 Or 172, 176 n 7, 864 P2d 368 (1993) (where relevant statutes did not confer authority on board to take particular action, board could not confer such authority on itself through rulemaking).

2

Those principles are fundamental to resolving the issue before us. As we have previously held, the power to parole an inmate does not inhere in the courts, the governor, or any executive branch agency. *See generally Anderson v. Alexander*, 191 Or 409, 420-28, 229 P2d 633 (1951) (discussing parole power generally; citing authorities with approval). Instead, it is for the legislature to decide whether any particular group or class of inmates is eligible for parole before the expiration of their court-imposed sentences and, if so, which branch of government will be responsible for making their parole decisions and on what terms. *Id.* Any examination of the board's authority in this case, consequently, should begin with the enabling legislation that confers authority on the board to parole juvenile aggravated murderers.

Identifying that authority is not, however, a straightforward exercise. As I will outline, only one statute serves as the potential source for the board's power to parole any aggravated murderer, adult or juvenile. That statute is ORS 144.110(2)(b), which provides that the board may not parole any person convicted of aggravated murder, except pursuant to ORS 163.105. As the majority concludes, not all of the procedural requirements of ORS 163.105 fit the circumstances of juveniles convicted of aggravated murder. That conclusion, however, means only one thing: the board is required by that statutory scheme to apply the procedural requirements of the statute to the degree possible. If none apply, then the board has the authority to adopt appropriate procedures, and the legislature has not confined the board's authority to do so. That conclusion does not mean, as the majority concludes, that ORS 144.110(2)(b) and the procedural requirements of ORS 163.105 are *inapplicable* to juvenile aggravated murderers. Any

3

such conclusion would require us to hold, as I will explain, that the board lacks authority to parole juvenile aggravated murderers at all, because no other statute gives the board such authority.

To provide some context for that analysis, it is helpful to briefly examine the board's parole authority more generally, from past to present.[2] The board's power to grant parole, and to adopt the policies and procedures for doing so, is of relatively recent vintage. That power did not reside in the board until approximately 1939. Before then, although a state parole board existed, the power to parole persons committed to the custody of the state prison system resided only in the governor and in the court that had sentenced an inmate. *See generally Anderson*, 191 Or at 420-21 (describing former scheme).[3] The board's role in granting parole was investigatory and advisory -- it provided information pertinent to the decision, and it could initiate a parole decision by recommending that the governor parole an inmate. *Id.*; *see also Fehl v. Martin*, 155 Or 455, 455-56, 64 P2d 631 (1937) (quoting then-effective statutes providing for governor's

---

[2] Throughout much of its history, the board was denominated the State Board of Parole and Probation, rather than the State Board of Parole and Post-Prison Supervision. *See, e.g.,* ORS 144.010 (1959) (creating board of five members). References to the board in this opinion include the board as it has been variously denominated over the years.

[3] *E.g.*, OCLA 26-1230 (providing that all courts "shall have the power * * * to parole persons convicted" of crimes); OCLA 26-2301 (creating parole board); OCLA 26-2304 (empowering board to supervise persons placed on parole, to make investigations, and to prepare a case history record to determine if they should be paroled).

4

power to parole inmates on governor's motion, or on recommendation of parole board). The board, however, had no parole power of its own.

The legislature dramatically changed that structure in 1939 when it created a statewide parole and probation system. *See generally* Or Laws 1939, ch 266 (creating state parole and probation system). With that change, the legislature vested authority in the parole board to make parole release decisions and simultaneously divested sentencing courts and the governor of that parole power. *See generally Anderson*, 191 Or at 420-21 (describing the legislative changes). In doing so, the legislature gave the board broad general authority both to make parole release decisions and to promulgate rules governing those decisions.[4] Eventually, the board's general parole power was codified in ORS 144.050. For 30 years, that statute changed little, except to alter the board's parole authority over inmates confined in county jails. *Compare, e.g.*, ORS 144.050 (1971) (board authorized to parole inmates confined in any county jail for six months or more) *with* ORS 144.050 (1987) (no board authority to parole county jail inmates). As to inmates committed to state penal institutions, the board's authority remained constant during that time: Subject to other applicable laws, the board had the power to parole "any" inmate committed to the custody of the Department of Corrections and "to

---

[4] Although the board's authority to determine parole policy and procedures was all but plenary for those inmates eligible for parole, many inmates were categorically ineligible for parole on any terms. They included habitual offenders and inmates serving a life sentence. *See* 21 Op Atty Gen 90, 92-93 (1942) (citing and discussing exclusions from board's parole authority).

5

establish rules applicable to parole."  ORS 144.050 (1987).

In 1989, however, the board's authority again underwent dramatic change. That year, the legislature adopted the so-called "sentencing guidelines" system, which resulted in determinate sentences for most offenders, with no eligibility for parole.  *See generally State ex rel Engweiler v. Cook*, 340 Or 373, 380-82, 133 P3d 904 (2006) (discussing former parole matrix system and current sentencing guidelines scheme).  In accord with that change, the legislature amended ORS 144.050 to limit the board's parole release authority to persons who had committed a crime before November 1, 1989:

> "Subject to applicable laws, the State Board of Parole and Post-Prison Supervision may authorize any inmate, who is committed to the legal and physical custody of the Department of Corrections *for an offense committed prior to November 1, 1989,* to go upon parole subject to being arrested and detained under written order of the board or as provided in ORS 144.350. *The state board may establish rules applicable to parole*."

ORS 144.050 (1989) (emphasis added).  Beginning with that amendment, and continuing to today, the board has *no* general power to parole *any* inmate whose crime of conviction was committed on or after November 1, 1989.  For inmates that the board may parole, however, the board retains broad rulemaking authority to establish policies and procedures for its parole release decisions.

If there were no other source of board authority to release any group or class of inmates on parole, this case would end with that statute.  The conclusion would have to be that, assuming that the legislature intended juvenile aggravated murderers to be eligible for parole, and thus to not necessarily serve their entire life sentence, the legislature had not yet provided for any entity to exercise parole release authority as to

6

that class of offenders.

But one other relevant statute does exist: ORS 144.110(2)(b). It provides, as it has since 1977, that the board "shall not release a prisoner on parole who has been convicted of murder defined as aggravated murder * * * except as provided in ORS 163.105." When the legislature enacted that statute, it was a restriction on the broad parole authority granted to the board under ORS 144.050. Now, with the retraction of parole release authority for any crime committed after November 1, 1989, ORS 144.110(2)(b) stands as the *only* statute that authorizes the board -- albeit in indirect terms -- to parole anyone, adult or juvenile, convicted of aggravated murder, regardless of the date of the offense. In that regard, ORS 144.110(2)(b) is both prohibition and authorization. Expressly, it declares that the board "shall not release" an inmate convicted of aggravated murder "except as provided in ORS 163.105." Under the terms of that statute, then, a person convicted of aggravated murder can be released on parole pursuant to ORS 163.105 or not at all.[5]

_____

[5] The majority expresses its disagreement with this analysis in a footnote. *See* ___ Or ___ at ___ n 14 (slip op at 26-27 n 14). As part of its response, the majority asserts that ORS 144.110(2)(b) and ORS 163.105, in combination, are not a grant of authority to parole aggravated murders, but are instead a restriction on that authority. I agree, as I acknowledge above, that those statutes are not the most satisfying source of authority to parole aggravated murderers, because of the indirect manner in which that grant of authority is expressed. But if ORS 144.110(2)(b) and ORS 163.105 are not such a grant, then there is none. The only statute that the majority points to as filling the void is ORS 144.050, which by its terms unambiguously grants the board authority to parole only those inmates whose crimes were committed before November 1, 1989. The majority reasons that the date limitation does not apply to aggravated murderers, because of a 1989 legislative "note" to ORS 144.110, which declared that certain statutes continue

7

The majority goes through the terms of ORS 163.105 at some length, analyzing, correctly, that many of its terms do not, and cannot, apply to juveniles, because juveniles are not subject to mandatory minimum sentences under ORS 161.620.[6] The majority's observations about the procedural aspects of ORS 163.105 that do not fit the circumstances of juvenile aggravated murderers are not wrong. But the majority's conclusion that ORS 144.110(2)(b) and ORS 163.105 therefore have *no application* to juvenile aggravated murderers proves too much. If those statutes do not apply, then the board lacks the necessary legislative grant of authority to make parole release decisions for that class of offender. There simply is no statute conferring authority on the board to release juvenile aggravated murderers on any other terms, and the board is not an entity that has inherent power of any kind.

I do not, however, agree that the misfit between the terms of ORS 163.105 and the circumstances of juvenile aggravated murderers renders that statute wholly without force or effect as to that class of offenders. Instead, on that point, I agree with

---

to apply to aggravated murderers. The cross-referenced statutes (which are all procedural in nature) do not include ORS 144.050. Thus, the majority's strained conclusion that the note somehow "effectively operates" to create "an exception to the date limitation in ORS 144.050" (___ Or at ___ n 14 (slip op at 27 n 14)) contradicts not only the express terms of ORS 144.050, but also those of the very provision on which the majority relies.

[6]     Worth noting is that the legislature that enacted ORS 144.110(2)(b) would have intended it to apply equally to adults and juveniles convicted of aggravated murder. ORS 161.620, which precludes imposition of a life sentence without possibility of parole or mandatory minimum sentence on a juvenile offender tried as an adult, was not enacted until 1985.

8

the Court of Appeals:

"We agree with relator that the fit between all the relevant statutes is not a comfortable one. *See Engweiler IV*, 343 Or [536,] 543, 543 n 7, [175 P3d 408 (2007)] (noting that, 'at least at first blush,' the 1989 versions of ORS 144.110(2)(b), ORS 163.105(1), and ORS 161.620 were 'potentially inconsistent'). Nevertheless, we conclude that he too quickly seizes on apparent tensions between the statutes in reaching the conclusion that they irreconcilably conflict, ignoring the obligation of the courts to search for a construction that gives effect to all relevant provisions. *See* ORS 174.010 ('where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all'); *Liles v. Damon Corp.*, 345 Or 420, 424, 198 P.3d 926 (2008) (noting obligation of the courts 'to give meaning to all parts of those statutes' in issue). Such a harmonizing construction is possible; the key, in our view, is discerning the difference between the authority of a court to impose a sentence and the authority of the board to implement it.

"As we have noted, ORS 161.620 (1989) precluded the 'imposition' on juvenile aggravated murderers of a 30-year 'mandatory minimum sentence,' that is, a 30-year term of confinement without possibility of parole as provided in ORS 163.105(1)(c). Ordinarily, the terms 'imposition' and 'mandatory minimum sentence' refer to those aspects of a criminal offender's sanction that are effectuated by a sentencing court, as opposed to those aspects of the sanction -- such as parole release -- that are implemented by an administrative agency such as the board. *See Engweiler IV*, 343 Or at 552-53 (explaining that the phrase 'mandatory minimum sentence' in ORS 161.620 (1989) 'mean[s] a minimum period of incarceration that a trial court, by statute, is required to impose as part of an offender's sentence' (citing *State v. Jones*, 315 Or 225, 844 P2d 188 (1992))); *see also Gaynor v. Board of Parole*, 165 Or App 609, 614-15, 996 P2d 1020 (2000) (distinguishing between authority of sentencing court to impose sentence and authority of Board of Parole and Post-Prison Supervision under ORS chapter 144 to implement sentence).

"ORS 163.105 (1989) itself expressly recognizes that distinction by prohibiting the board and DOC from paroling or releasing (for example, on work release or other forms of temporary leave) an offender sentenced by a trial court to life without possibility of parole, ORS 163.105(1)(b), and by conferring on the board the authority to carry out procedures applicable to persons sentenced to life with the possibility of parole. Indeed, in *Engweiler IV*, in answering a certified question from the federal district court -- whether the 1989 versions of ORS 144.110(2)(b), ORS 163.105(1),

9

and ORS 161.620 'combined to create a situation in which certain juveniles * * * convicted of aggravated murder were not entitled to the possibility of parole,' 343 Or at 543 (footnote omitted) -- the Supreme Court limited its analysis entirely to the effect of ORS 161.620 (1989) on subsection (1) of ORS 163.105 (1989) and did not so much as mention any other subsections of the latter statute.

"Thus, when ORS 161.620 (1989) stated that 'the sentence imposed' upon a juvenile convicted of aggravated murder may not include any mandatory minimum sentence, that directive precluded a *sentencing court* from imposing an aspect of the *sentence* set out in subsection (1)(c) of ORS 163.105 (1989). It said nothing, however, about the authority of *the board* to implement the remaining portions of the statute concerning release decisions, as set out in ORS 163.105(2) to (4) (1989). *Cf. State v. Walker*, 192 Or App 535, 547, 86 P3d 690, *rev den*, 337 Or 327 (2004) (where numerous statutes demonstrated that the legislature knew how to refer to a particular administrative agency, the fact that it did not do so in the statute at issue made it unlikely that it intended the latter statute to encompass that agency). In other words, merely because *a court* may not impose a particular sentence mentioned in ORS 163.105(1) does not necessarily require the conclusion that *the board* does not remain subject to the requirements of the balance of the statute with respect to juvenile aggravated murderers."

*State ex rel Engweiler v. Powers*, 232 Or App 214, 225-27, 221 P3d 818 (2009) (footnote omitted) (emphasis in original).

In short, the inconsistencies that exist between the procedures required by ORS 163.105 and the circumstances of juvenile aggravated murderers can be reconciled, and should be. Any other conclusion leaves the parole board powerless to exercise parole release authority as to that class of offender, because the legislature has not conferred that authority on the board, and because ORS 144.050 and ORS 144.110(2)(b) expressly would prohibit the exercise of release authority on any other terms.

For that reason, the board not only was authorized to promulgate the rules that petitioner challenges, it arguably was obligated to do so. Under those rules, the

10

board holds a prison term hearing at which it determines a future date (no fewer than 20 years of incarceration) to review the juvenile offender's suitability for eventual parole; the board does not, at that initial hearing, set a binding parole release date.[7] OAR 255-032-0005(4) (1999) (provision for "prison term hearing"); OAR 255-032-0011(2) (1999) (board may set review date rather than projected release date at prison term hearing, or may deny parole). At the future review, the board considers the inmate's institutional conduct and rehabilitation efforts, after which the board may establish a parole release date or may set another review date, at which it will further review the inmate's conduct and rehabilitation efforts. OAR 255-032-011 (6)-(7) (1999). Those rules, and the procedures they require, are entirely consonant with those procedures of ORS 163.105 that have application to juvenile aggravated murderers serving life sentences. Even if the board was not obligated to promulgate those rules to best effectuate the terms of ORS 163.105, at the least, the board was entitled to exercise its broad rule-making authority under ORS 144.050 to adopt those policies. Nothing in the statutory scheme *precludes* the board from exercising its rulemaking discretion in that way.[8]

---

[7] When the board sets an actual release date, it is legally obligated to release the inmate on that date, subject to limited exceptions. *See* ORS 144.245 (so providing); *Hamel v. Johnson*, 330 Or 180, 187, 998 P2d 661 (2000) (inmate who does not have an unexpired minimum term must be released on the scheduled release date).

[8] The majority never grapples with this fundamental point about the statutory scheme. Much of the majority's analysis is devoted to why ORS 144.110(2)(b) and ORS 163.105 do not apply to juvenile aggravated murderers. I disagree with the majority's analysis in that regard, for the reasons I have described. But the majority's analysis is flawed for a second reason -- it establishes only that the board is not *obligated* to follow

11

Because the board's only authority to parole any person convicted of aggravated murder (including a juvenile) arises under ORS 144.110(2)(b), which incorporates the procedural requirements of ORS 163.105, the board was not obligated to set a release date for petitioners shortly after they began serving their life sentences. Instead, either because those statutes require the board to do so, or because the board has discretion to do so in the exercise of its broad parole rulemaking authority, the board was authorized to adopt a procedure whereby it first sets a future date to review the inmate's conduct and rehabilitation efforts, and based on that review, sets a parole release date only after determining that the inmate is susceptible to rehabilitation. Consequently, in resolving the rule challenge brought by petitioner Sopher, I would conclude that the rules are valid. For the mandamus cases brought by relators Engweiler and Sopher, I would affirm the decisions of the Court of Appeals vacating the peremptory writ issued by the circuit court and remanding for dismissal of the relators' petitions.

For the above reasons, I dissent.

Kistler, J., joins in this dissent.

---

the procedural dictates of ORS 163.105 to the extent that they can be applied to juveniles. That conclusion does not mean that the board is unable to exercise its broad rulemaking authority to the same end. Said another way, ORS 163.105 creates a duty for the board to make parole decisions in a particular way, one that limits the board's otherwise broad authority to make rules for parole decisions. Removing that duty, and thus that limitation, means only that the board's authority is unconstrained by the legislative policies that are in place for adult aggravated murderers. It does not mean that the board lacks authority to adopt parallel policies for juvenile aggravated murderers sentenced to life imprisonment.

1